

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00312-CV

_____

IN THE MATTER OF D.T., A JUVENILE

_____

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. 13147-JD-B

_____

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

### I. Introduction

Appellant D.T. was twelve years old when he stipulated to and was adjudicated delinquent for having committed aggravated sexual assault of a child by intentionally or knowingly causing the sexual organ of a child under the age of fourteen[1] to contact his mouth or tongue, which would be a first-degree felony offense for an adult. *See* Tex. Penal Code Ann. § 22.021(e). The juvenile court placed D.T. on two years' probation and then modified his probation twice. *See* Tex. Fam. Code Ann. § 54.05.

In three issues, D.T., who is now fifteen years old, complains about the second modification and disposition,[2] arguing that the juvenile court abused its discretion (1) by denying his motion for dismissal of the State's modification petition, (2) by finding that he violated his probation, and (3) by ordering his probation extended until he turns eighteen. Because the record reflects no abuse of discretion, we affirm.

### II. Discussion

A juvenile court is vested with considerable discretion in determining the suitable disposition for a child who has been adjudicated as having engaged in delinquent conduct and "in proceedings to modify an earlier disposition." *In re M.N.*,

---

[1]The record reflects that D.T.'s victim was a six-year-old relative at the time of the offense.

[2]In juvenile cases, "disposition" is "akin to sentencing and is used to honor the non-criminal character of the juvenile proceedings." *In re D.L.*, 541 S.W.3d 917, 920 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

No. 02-18-00044-CV, 2019 WL 1715981, at \*1 (Tex. App.—Fort Worth Apr. 18, 2019, no pet.) (mem. op.); *see In re J.M.*, No. 02-19-00325-CV, 2020 WL 3987581, at \*2 (Tex. App.—Fort Worth June 4, 2020, no pet.) (mem. op.) (stating that the court reviews a decision to modify a juvenile disposition for an abuse of discretion); *see also In re L.A.G.R.*, Nos. 07-14-00072-CV, -00073-CV, 2014 WL 5462540, at \*3 (Tex. App.—Amarillo Oct. 28, 2014, pet. denied) (mem. op.) (requiring probation violation to be found by a preponderance of the evidence).

A juvenile court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *M.N.*, 2019 WL 1715981, at \*1. It does not abuse its discretion simply by basing its decision on conflicting evidence. *In re C.C.*, No. 02-17-00216-CV, 2018 WL 1865804, at \*3 (Tex. App.—Fort Worth Apr. 19, 2018, no pet.) (mem. op.). We will not find that the juvenile court abused its discretion so long as some evidence of substantive and probative character exists to support its decision. *Id.* In conducting our review, we engage in a two-pronged analysis: (1) did the juvenile court have sufficient information upon which to exercise its discretion, and (2) did it err in its application of discretion? *Id.* We apply the civil standards of review for the legal and factual sufficiency of the evidence[3] to support a

---

[3]Under the legal-sufficiency standard of review, we may sustain such a challenge only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields v. Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). In determining whether

disposition decision. *In re B.R.*, No. 02-19-00328-CV, 2020 WL 3969556, at *2 (Tex. App.—Fort Worth June 18, 2020, no pet.) (mem. op.).

## A. Motion for Dismissal

In his first issue, D.T. argues that the juvenile court abused its discretion by denying his motion for dismissal. In his second issue, he complains that the juvenile court abused its discretion by finding that he violated a probation condition regarding sex offender treatment, relying on the same argument that he makes in his first issue.

### 1. Background

During the modification portion of the State's case, the juvenile court took judicial notice of the pleadings that had been filed in the case.

---

legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). Anything more than a scintilla of evidence is legally sufficient to support a finding. *See 4Front Engineered Sol., Inc. v. Rosales*, 505 S.W.3d 905, 909 (Tex. 2016).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

In its original petition, the State alleged that D.T. had committed an April 2018 aggravated sexual assault of a child, and in July 2018, the juvenile court placed D.T. on twenty-four months' probation that contained both regular and sex-offender conditions. Condition (z) of D.T.'s regular probation conditions required him to attend, participate in, and successfully complete the sex offender treatment program. Although D.T.'s probation was set to end in July 2020, it was made "subject to subsequent extensions and additional proceedings" until he reached age 18.

In February 2019, the State petitioned to modify and extend D.T.'s disposition, alleging that in January 2019, D.T. had failed to complete the sex offender treatment program, violating Condition (z). D.T. stipulated that he had "fail[ed] to complete Sex Offender Treatment Program to the satisfaction of the treatment provider," and in April 2019, the juvenile court entered a "Modified Order of Probation until July 1, 2020." The April 2019 order was originally titled "Modified Order of Probation until 18th Birthday," but "18th Birthday" was lined out and replaced by "July 1, 2020," the same ending date as D.T.'s original twenty-four months of probation.

The April 2019 order added some conditions.[4] As in the earlier order, it stated that D.T. would be "subject to subsequent extensions and additional proceedings until [he] is eighteen (18) years of age." Also as in the earlier order, D.T. was required to

---

[4]The new conditions provided, among other things, that D.T. would be placed in the probation department's custody, that he would remain in the juvenile detention center until placed in the residential placement program, and that he would successfully complete the residential placement program.

attend, participate, and successfully complete the sex offender treatment program. Condition #21 of the additional sex-offender conditions—the condition at issue in the instant appeal—was included verbatim from the earlier order and required D.T. to

> complete treatment within two years of disposition and show moderate progress as determined by the treatment provider and supervising probation officer in the sex offender specific program within one year of beginning the program. If it is not determined that [D.T.] has made adequate progress, a violation of probation may be charged against [D.T.]

The record does not reflect that D.T. objected to any of the conditions or sought clarification of any of them.

A week later, D.T. was placed in a juvenile "Boot Camp," where he remained until January 2020. After almost nine months, on January 6, 2020, a juvenile probation officer requested D.T.'s release from boot camp based on D.T.'s having "successfully completed his . . . stay at the placement facility."

Five months after D.T.'s release from boot camp and return to the sex-offender treatment program, the State filed a new petition to modify and extend D.T.'s disposition. *See J.M.*, 2020 WL 3987581, at *2 (explaining that modification of juvenile disposition is divided into two phases—the first involves determining whether the juvenile has violated his probation and the second involves determining the necessary modification). In its petition, the State alleged that on May 21, 2020, D.T. had violated Condition #21 "by failing to complete treatment within 2 years of disposition and/or show moderate progress as determined by the treatment provider

6

and supervising probation officer in the sex offender specific program within one year of beginning the program in violation of a valid court order signed on April 3, 2019."

The trial court held a hearing on the petition in September 2020—after the July 1, 2020 expiration of D.T.'s probation. *See* Tex. Fam. Code Ann. § 54.05(l) (providing that as long as a motion for modification is filed before the supervision period ends, the trial court has until the first anniversary of the probation period's expiration date to extend the probation period). D.T. continued to participate in the sex-offender treatment program after his probation expired. At the hearing, D.T. pleaded not true but did not otherwise object or raise special exceptions to the State's petition.

### 2. The State's Modification Evidence

Dr. David Sabine, a clinical psychologist, licensed sex offender treatment provider, and director of the Wichita County Juvenile Probation Department's Sex Offender Treatment Program,[5] testified that he had been supervising D.T. He explained that in the sex offender treatment program, offenders worked to understand their sexual behavior problems and the cognitive errors that supported such behavior and also worked on relapse prevention and the development of

---

[5]Dr. Sabine had been the director of Wichita County's sex offender treatment program for twenty years. He had a bachelor's degree in religion and philosophy from Southwestern Nazarene University, a master's degree in divinity from Nazarene Theological Seminary, and a master's degree in psychology and doctorate in clinical psychology from the University of Louisville. He did his predoctoral fellowship at Yale University and spent his postdoctoral year at Wichita Falls Rehabilitation Hospital in "rehab medicine."

empathy. He required offenders to attend group therapy and group counseling, to demonstrate an understanding of various content areas, and to complete polygraph examinations. Dr. Sabine stated that an offender is considered for graduation from the program "when [he] complete[s] an exit interview that reflects [his] mastery" of the coursework.

Dr. Sabine stated that in his professional opinion, D.T. had not completed the sex-offender-treatment-program portion of his probation. He observed that D.T. had failed to

> demonstrat[e] mastery over his sexual impulses and his sexual preoccupation, both in terms of his thinking and his behavior. At the time that this, um, expired, his term, there still are important things he needs to do in order to be safe. . . . He's making progress, but he's not there yet, and there are things in his May polygraph that were very concerning that we felt like we needed to hold him over.

Dr. Sabine opined that there was a higher risk that D.T. would reoffend if he did not continue in the program. He acknowledged that D.T. had passed five polygraphs in a row.

Dr. Sabine testified that D.T. "came into the program in April of 2018, and was there for a time, went away to a residential treatment for a time and then returned to us this last year, and he's been in the program ever since." During cross-examination, Dr. Sabine elaborated, stating that D.T. went to the residential boot camp "because of treatment failure at one point." The record reflects that D.T. was ordered to the boot camp on April 10, 2019.

During cross-examination, Dr. Sabine stated that in some areas D.T. had made excellent progress but in others he had "made very little progress." He testified that this did not amount to an average of "moderate overall" because "this would not be something you could average because the things where he's not made progress may be considered high risk in terms of the future." He opined that D.T. needed more time in the program.

Brian Box, D.T.'s supervising probation officer, testified that he and Dr. Sabine monitored D.T. and that D.T. had not completed the sex offender treatment portion of his probation. On cross-examination, Box agreed that D.T. had participated in the sex offender treatment program, had done the things that were asked of him as part of it, and had made some progress in the program.

At the conclusion of the State's modification case, D.T.'s counsel moved for dismissal of the petition. He pointed out that the State's evidence showed that D.T. had made progress and argued the April 3, 2019 disposition ordered D.T. to complete the treatment program within two years of that disposition, which would make the completion date not July 1, 2020, but April 3, 2021, a date still in the future. D.T.'s counsel argued, "He has two years to complete that treatment [program]. He's made progress. He hasn't been removed from the program. Therefore . . . he cannot be violated based on failure to complete the program."

The juvenile court denied D.T.'s motion, stating that the April 2019 order did not extend the original two years to April 2021, that D.T.'s "probation ran [until] July 1 of 2020," and that there was sufficient evidence to deny the motion.

### 3. Analysis of D.T.'s First Issue

In his first issue, D.T. complains that the State "presented no evidence whatsoever indicating a violation of a reasonable and lawful order of probation," relying on the construction of Condition #21 that he presented to the juvenile court during the hearing.

We disagree. Notwithstanding D.T.'s argument that the plain language of Condition #21 gave him a two-year period from disposition (and the State's argument on appeal that the condition's plain language did not include the words "modified" or "amended" before the disposition and therefore did not extend his time to complete the program into 2021), the record reflects that D.T. failed to comply with the remaining portion of Condition #21: "show *moderate* progress as determined by the treatment provider and supervising probation officer in the sex offender specific program within *one year* of *beginning* the program."[6] [Emphases added.]

D.T. began the program in April 2018. In February 2019, ten months later, the State sought to modify and extend his probation the first time on the basis that D.T.

---

[6]The State also reminds us that probation is a contract, *see Dansby v. State*, 448 S.W.3d 441, 447 (Tex. Crim. App. 2014), and that contracts are to be construed based on their plain language. *Compass Bank v. Calleja-Ahedo*, 569 S.W.3d 104, 114 (Tex. 2018).

10

had failed to complete the sex offender treatment program, referencing Condition (z).[7] On April 3, 2019, D.T. stipulated to having violated this probation condition in violation of the July 2018 disposition. The juvenile court found that D.T. had violated his probation as alleged by the State and "as amended at trial,"[8] and it entered the modified order of probation. The order's probation period did not change, however—its end date was still July 1, 2020. D.T. then spent almost nine months (April 10, 2019–January 6, 2020) in a boot camp treatment program and five more months in the sex offender treatment program (January–May 2020) before the State filed its second petition for modification and to extend disposition in June 2020. The State alleged in its second petition that

> on or about May 21, 2020 . . . [D.T.] did then and there fail to comply with . . . [Condition] #21 by failing to complete treatment within 2 years of disposition and/or show moderate progress as determined by the treatment provider and supervising probation officer in the sex offender specific program within one year of beginning the program in violation of a valid court order signed on April 3, 2019.

Without reaching the parties' construction arguments about the "2 years of disposition," *see* Tex. R. App. P. 47.1, we conclude that the juvenile court did not

[7]In his appellant's brief, D.T. states that the State's February 22, 2019 petition to modify and extend disposition alleged "that D.T. failed to complete the Sex Offender Treatment Program as required by Condition 21." However, the State's February 22, 2019 petition alleged a violation of Condition (z). Condition (z) and Condition #21 are not identical, although they both require attending, participating (making progress), and completing the sex offender treatment program.

[8]The record does not reflect how the State's petition was amended at trial in the first modification.

abuse its discretion by denying D.T.'s motion for dismissal and by finding that D.T. had violated the "moderate progress . . . within one year of beginning" portion of the condition[9] in light of D.T.'s removal from the program and placement in boot camp and Dr. Sabine's and Box's testimonies that D.T. had not made adequate progress to discharge him from the program. We overrule D.T.'s first issue and turn to the evidence he presented before reaching his second issue.

### 4. D.T.'s Modification Evidence

During D.T.'s case, Dr. Sabine testified that D.T. had actively participated in the sex offender treatment program and "had tried to be honest and open and straightforward." Dr. Sabine credited D.T.'s earnestness and sincerity but noted that D.T. had "disclosed many things in the polygraphs that are very concerning." Some of these disclosed items included D.T.'s "unusual sexual interest . . . in horses," his compulsive masturbation, his rape fantasies, and his admitting to having thought about his victim "as recently as May." D.T. had also admitted to tasting and eating his own feces.

---

[9]To the extent that D.T.'s probation had already been modified once based on a similar but differently worded and numbered condition, *see Rains v. State*, 678 S.W.2d 308, 309–10 (Tex. App.—Fort Worth 1984, pet. ref'd) (quoting *Rogers v. State*, 640 S.W.2d 248, 252 (Tex. Crim. App. 1981)), D.T. did not raise any due process objections in the juvenile court, and he does not raise any on appeal. *See* Tex. R. App. P. 33.1; *In re C.D.H.*, 273 S.W.3d 421, 425 n.4 (Tex. App.—Texarkana 2008, no pet.) (stating that within the context of juvenile probation revocation hearings, a due process complaint must have been raised in the trial court to preserve error for appellate review).

Dr. Sabine testified that D.T. attended group therapy with other adjudicated youth sex offenders every Tuesday and Thursday. Dr. Sabine said that he also held family meetings with D.T. and his parents that would last from 10 to 15 minutes "if everything is kind of going along" or could last up to 45 minutes when the family had concerns.

Dr. Sabine testified that "from early on" he had suspected that D.T. had autism and that he had spoken with D.T.'s family about D.T.'s autism issue "a number of times," but for the first two years, Dr. Sabine's treatment summaries did not reflect his suspicion. He stated that an autism evaluation did not reveal evidence of autism, but that evaluation was based on forms completed by D.T.'s parents, and those forms "came back negative." Dr. Sabine explained that the autism evaluation had required D.T.'s parents to have "openness and insight into those behaviors in order to find [D.T.] positive" for autism.

Dr. Sabine testified that before D.T. went to boot camp,[10] he had spent hours trying to find treatment facilities that treated children with both sexual offending behaviors and autism-related behaviors and "looked up research on how to treat kids who have sex offense behaviors and autism" because he was concerned that D.T. might not find the right placement. However, until May 2020, none of Dr. Sabine's

---

[10]Dr. Sabine acknowledged that a boot camp counselor who had treated D.T. had been arrested for child pornography but said that he did not know the counselor's sentence. D.T.'s mother testified that the boot camp counselor had pleaded guilty and accepted a fifty-year sentence and that she had serious concerns about the boot camp.

treatment summaries acknowledged that D.T. was autistic. In the May 2020 summary, Dr. Sabine stated, "[D.T.] clearly demonstrates, in my opinion, evidence of autism spectrum disorder, and this should be taken into account in terms of treatment."

Dr. Sabine said that D.T. had maintained his grades and mandatory family participation but that "what's been especially hard is that part about the impulses and the thoughts that he's acknowledged." Dr. Sabine opined that because D.T. suffered from autism spectrum disorder, it was difficult for him to master some of the treatment concepts because of the "sort of black and white sort of concrete way that [he] thinks" and D.T.'s social-interaction and social-connection problems. Dr. Sabine stated, "Children who don't have autism may have an easier road to empathy," while autistic offenders might not understand the normal connection between their behavior and harm to the victim. Dr. Sabine explained that D.T. struggled with emotional intelligence, with understanding the consequences of his behavior, and with interacting with others. He explained that because of this additional autism-related risk factor, D.T. required more time in the program, the goal of which was to help D.T. "reach[ ] an acceptable level of safety for himself and the community."

Dr. Sabine said that he did not have a formal written treatment plan for D.T. "other than his psych evals" and quarterly updates "of where we're going and what we're planning to do next." He said, "[I]n a sense, those . . . quarterly reports represent [D.T.'s] treatment plan." He stated that the quarterly summaries contained D.T.'s relapse prevention plan, which was "to work on thoughts and behaviors that

have inclined him toward offending and to reduce those behaviors," and that D.T. could recite the plan "verbatim." Dr. Sabine did not have a specific document setting out the relapse prevention plan but stated, "[I]t would be very easy to generate. I could give you a paragraph. That's about how much it would take."

Dr. Sabine acknowledged that to comply with D.T.'s probation, D.T.'s family had been living in separate households since early 2018, with D.T. and his father living in one household and his mother and the victim in another. Dr. Sabine stated that "every effort has been made to reunify the family short of sending [D.T. to a reunified] home prematurely." When asked to list his efforts, he stated that he had met with the family and expressed to them his concerns and things that had to change in D.T.'s thoughts and behavior for him to safely return to a reunified home. On cross-examination, when the prosecutor asked why D.T. had not been reunited with his whole family, Dr. Sabine replied, "Because . . . his victim is in the home and he hasn't gotten to the place in treatment where he can safely be in the home."

Dr. Sabine used movies with his group therapy patients. In 2020, he showed them "Searching for Bobby Fischer," a ninety-minute movie that required two group sessions to watch. He also showed them "Call of the Wild," another two-session viewing. He agreed that D.T. had seen the 2012 version of "Les Miserables," another two-session movie, twice because of how long D.T. had been in the program and "because that's an especially important film for [the] kids to see." When questioned about "Les Miserables," Dr. Sabine acknowledged that there was an implied rape

scene and that prostitution was implied and discussed directly but said that "[i]t's part of the exploitation we discuss in . . . covering . . . the substance of the film."

In explaining his use of movies with his group therapy patients, Dr. Sabine stated,

> One of the things that's most difficult with these guys is kind of getting past their defenses. They're very defended boys who come with a lot of resistance. And one of the things we know, going all the way back to the parables of Jesus, is that stories have the ability to work beneath those defenses to help us gain a sense of empathy and understanding that does not come through sort of being preached at and lectured at in a didactic setting.
>
> So interspersing session after session after session of bearing down and doing disclosures and all the other things we do, to bring this in is a -- in my view, a very helpful tool. And so we discuss the movie. We discuss what they should take from it or what they could take from it. We try to get them to develop critical thinking skills to say this is what went on, this is what's important, and this is how it relates. We always come back to how does it relate to you, specifically, as a person who's acted out sexually and is a sex offender?

L.T., D.T.'s mother, testified that since D.T. had been on probation, he had done everything he had been asked to do. She stated that he had progressed as far as the program's standards went but opined that in two years, the program "hasn't helped him any." She expressed her concerns about the types of things D.T. had been exposed to in the program, stating,

> The very first group he attended, he called me when he got home and said, Mama, do you know people have sex with animals? My son is very easily swayed. He's very easily persuaded to do things. Um, he's autistic. He's a follower, and he does what other people do. Um, he attempts to be friends with everybody, and if that includes doing something -- . . . If he thinks doing something stupid will make him a new friend, then he'll

16

do it. But that's his mentality. He's – He's a wonderful young man. He made a stupid mistake.

L.T. also stated that she had been unaware that Dr. Sabine had diagnosed D.T. with autism because Dr. Sabine had told her and D.T.'s father that D.T. was not autistic. L.T. said that she had urged Dr. Sabine to test D.T. for autism for two years. From her perspective, D.T.'s treatment program had not changed with the autism diagnosis, and he had not been diagnosed with autism prior to his boot-camp placement. L.T. stated that when D.T.'s probation officer had looked for a placement for him, she and D.T.'s father were "led to believe that they could not find a suitable place for him that would accept him with autism and the crime he had been accused of. Then they determined that he could attend this boot camp because he did not have autism."

L.T. testified that one of D.T.'s sex-offender probation terms was that he could not change sex offender treatment providers and said "yes" when asked whether her understanding was "that he either sinks or swims with Dr. Sabine's program." She agreed on cross-examination that she was not an expert in sex offender treatment, but she disagreed with Dr. Sabine's treatment for D.T. She acknowledged that she had voiced those concerns to D.T. but disagreed that this might impede D.T.'s treatment progress.

After putting on his modification evidence, counsel for D.T. again argued that D.T. had not violated Condition #21 because he had made moderate progress and

that the "two years from the date of disposition" did not expire "until April of 2021" even though the April 2019 order expressly terminated D.T.'s probation on July 1, 2020. He asserted,

> The State wrote the term. They could have crafted it any way they wanted to. They could have said complete sex offender treatment by July of 2020. They did not. They could have crafted it in many ways. But the way it's written, he's not in violation. He's made moderate progress. And according to Dr. Sabine, if he just continues on keeping on, he's going to get where he wants him to be.

The prosecutor then responded that D.T. had to show moderate progress in all areas of his sex offender treatment program, not just one area, and that D.T. had failed to do so within the allotted time: "He's not done that within the year. He's not done that within the two years."

### 5. Analysis of D.T.'s Second Issue

D.T. raises the same argument about Condition #21's "within 2 years of disposition" language in his second issue as he did in his first. For the same reasons set out in our review of D.T.'s first issue, but based on our review of all of the parties' modification evidence, we conclude that the trial court did not abuse its discretion by finding that D.T. violated Condition #21 and by denying his motion for dismissal. We overrule D.T.'s second issue.

### B. Sufficiency of the Evidence to Support Extension

In his third issue, D.T. argues that the trial court abused its discretion by extending his probation until he turns eighteen because the evidence is legally and

factually insufficient to support the extension. We incorporate the modification evidence above and now review both parties' disposition evidence.

### 1. Social Histories[11]

Before the disposition hearing began, the juvenile court took judicial notice of all of the contents of its file except for a supplemental social history filed on September 18, 2020, which D.T.'s counsel had not received. *See* Tex. Fam. Code Ann. § 54.04(b) (stating that on or before the second day before the disposition hearing, the court shall provide the child's attorney and prosecutor with access to all written matter to be considered by the court in disposition).

D.T.'s June 2018 social history contained D.T.'s statement about the original offense—that he had pulled aside the six-year-old victim's underwear and licked her female sexual organ with his tongue—because he was curious. It also stated that he had not displayed any behavioral problems at school or in detention, that he made good grades, that he participated in jujitsu and wrestling, that he was active in his church, and that he had been respectful and cooperative with the juvenile probation department.

Dr. Sabine conducted a psychological evaluation of D.T. in 2018 and diagnosed him with attention deficit hyperactive disorder, hyperactive-impulsive type-mild. Dr.

---

[11]Under Section 54.04, at a disposition hearing, the juvenile court "may consider written reports from probation officers, professional court employees, guardians ad litem . . . , or professional consultants in addition to the testimony of witnesses." Tex. Fam. Code Ann. § 54.04(b).

Sabine's October 10, 2018 addendum noted that D.T.'s parents had completed the Social Responsiveness Scale, 2nd Edition (SRS-2), the Gilliam Autism Rating Scale (GADS), and the Gilliam Asperger's Disorder Scale, 3rd Edition (GARS-3) and that all three test results "were within normal limits." He also included the results of D.T.'s Rorschach Inkblot Test, which were "consistent with [D.T.'s] presentation in terms of his limited interest in others, and limited ability to form close attachments, as well as[] having difficulty identifying with the thoughts and feelings of others."

The juvenile court ordered D.T. detained for a probable cause hearing in March 2019. D.T.'s supplemental social history from March 2019 reflected that on September 13, 2018, D.T. had been referred for a probation violation after he provided "deceptive" responses to a polygraph examination. The September 2018 probation department recommendation also stated that, regarding the September 13, 2018 polygraph, D.T. had "admitted to touching five or six year old females vagina's [sic] over their clothing while at martial arts classes" and that in his post-polygraph interview, he admitted that prior to being placed on probation, he had seen "a rape scene on a Law and Order TV show. Afterwards, he tried acting it out with his adjudicated victim. He said he pinned her to the wall and 'dry humped' her."[12] D.T. also disclosed that he had his dog lick his penis during the week before

---

[12]The July 2018 order stated, "The District Attorney agrees not to pursue any modification, enhancement, or new charges for any conduct involving [D.T.] and [his victim] if occurring prior to April 10, 2018."

his September 2018 polygraph. In a December polygraph, D.T. again "admitted to touching [the] dog inappropriately. He said that he touched the dog's vagina and played with her nipples."

On January 31, 2019, Dr. Sabine removed D.T. from the sex-offender treatment program and recommended placing him in boot camp because

> [D.T.] does not seem to be connected to shame and seems to enjoy talking about his offenses and does so in a very matter of fact way. It was noted that though being quite intelligent, [D.T.] has very little insight and no emotional connection to his behavior and its consequences. It was also noted that [D.T.'s] sexual fantasies are deviant and involve [his victim]. He also has fantasized about rape. Residential treatment is recommended so that [D.T.] can deal with his issues in a more comprehensive way and maintain safety for the community in the meantime.

## 2. The State's Disposition Evidence

The prosecutor reoffered Dr. Sabine's testimony, and Box, D.T.'s probation officer, recommended that D.T. be extended on probation until his eighteenth birthday and that he continue sex-offender treatment with Dr. Sabine. Box said that D.T. had made admissions to him and his supervisor about "fantasizing about sex, anal sex with horses, . . . masturbat[ing] with his [victim's] pillow . . . and fantasiz[ing] about having sex with her."

Box stated that D.T. had been deemed a treatment failure when he was sent to boot camp but that since his return, "he has not been deemed a treatment failure." When asked during cross-examination about whether Dr. Sabine was qualified to diagnose autism, Box said, "I can't speak to his qualifications." He acknowledged that

Dr. Sabine had cancelled family meetings and said that he was not aware of any changes in Dr. Sabine's treatment plans for D.T. since determining that D.T. had autism.

### 3. D.T.'s Disposition Evidence

Before beginning his case, D.T. informed the juvenile court that he was asking for a ruling of "no disposition" and that he would be putting on evidence of alternative treatments available to him if no disposition was ordered.

D.T.'s father D.E.T., a retired police officer, stated that D.T. had been in martial arts training since he was three years old, that D.T. was a straight-A student, and that D.T. went to boxing practice every weekday. He stated that D.T. had some wrestling skills that the family hoped would someday result in a college scholarship. D.E.T. also testified that as a term of D.T.'s probation, he and D.T. lived in one household while D.T.'s mother and D.T.'s victim lived in another household and that they had done so for "a little over two years." D.E.T. stated that he and L.T. had done everything required by D.T.'s probation. He also stated that although D.T. had attended each of his group sessions, Dr. Sabine "usually" gave no excuse when he cancelled sessions. D.E.T. cited as an example that Dr. Sabine had missed a group meeting within the last month without explanation. He opined that he and L.T. could provide a better treatment program for D.T. than Dr. Sabine.

D.E.T. stated that he had not known D.T. was autistic until Dr. Sabine told them "almost a year-and-a-half, two years ago" and that he thought it should have

been pursued but that it was not. D.E.T. said that Dr. Sabine's May 2020 treatment summary was the first time Dr. Sabine had said more than that he just suspected autism.

On cross-examination, D.E.T. said that the house in Oklahoma where L.T. and the victim currently lived, and where he and L.T. wanted to reunify the family, had video cameras everywhere but the bathroom and closet. He said that the victim would be safe from molestation because he and L.T. would supervise D.T. and never let D.T. and his victim be alone together.

D.T. also offered character testimony from a county commissioner who had gone to church with D.T.'s family for the last ten years, an attorney who had coached D.T. in judo, D.T.'s head judo coach, and D.T.'s jujitsu instructor, each of whom knew the family on a personal level and believed L.T. and D.E.T. would provide a committed course of rehabilitation for D.T.

On cross-examination, the jujitsu instructor agreed with the prosecutor's summary that D.T. was "actively learning how to use advanced techniques to subdue people and wrestling them and keeping them where he wants them," but he added that the primary focus was self-defense and that D.T. was a "white belt, still a beginner."

Rose Boehm, a licensed professional counselor, testified both as a friend of D.T.'s family and as an expert.[13] Among other things, in her 50 years of practice, Boehm had provided individual and group therapy for child and sexual abuse victims and their families and had performed sex offender evaluations, including working for Denton County's Children's Advocacy Center in sex offender treatment.

Boehm had worked with autistic children who were sex offenders. She stated that autistic children who are sex offenders require individual therapy instead of group therapy because, based on the way most groups are set up, autistic children "are exposed to the descriptions of other people's sexual offenses, and they can be quite impressionable" and subject to suggestion in group settings. When she worked for Denton County in sex offender treatment at the Children's Advocacy Center, the two-year program she used resulted in 90-to-95 percent successful completion by the children in the program who were incest offenders.

Boehm opined that group therapy was not an effective way to treat D.T. Dr. Sabine's use of the 2012 version of "Les Miserables" to treat juvenile sex offenders concerned her because of the film's depictions of sexual intercourse and prostitution.

Boehm stated that a treatment program for a child sex offender should be written down, shared with the parents, shared with the child, and shared with the

[13]Boehm had a bachelor's degree in preclinical psychology and a master's degree in clinical psychology from the University of North Texas. She had also been a registered clinical psychologist in Australia and stated that she had testified as an expert several hundred times.

probation officer—on hard copy—and that the program should be periodically revised as goals were accomplished. She stated that a relapse prevention plan could be "quite elaborate" because the offender and therapist should identify problematic situations and feelings and ways to exit those situations. It was something the offender should carry around with him so that in a novel or uncertain situation, he could refer to the plan and develop an exit strategy.

Boehm opined that D.T. "probably needs somebody who specializes in working with high level autistic children who's also familiar with some of these other behavior problems that go along with that" and that just continuing D.T. in Dr. Sabine's program of group therapy, polygraphs, and family meetings would not result in his rehabilitation. She stated that the best way to handle family reunification was how Denton County did it: "The children are returned to the family after an offense like this as soon as there is a safety plan and as soon as there are alarms on the doors, and that usually was within a few days of th[e] hearing." She was concerned about D.T.'s family's being separated for so long because "any child in that kind of program[] needs a very, very stable home situation and needs both those parents there to help him." Boehm said that it would be unethical for her, as a family friend, to be D.T.'s counselor but that she could help his family find resources to treat him.

During cross-examination, when asked whether there would be any supervising authority over D.T. if he were immediately dropped from probation, Boehm replied

that his parents L.T. and D.E.T., who "didn't know about [the abuse] before," would monitor him.

L.T., who had been employed by a county jail until an inmate assault rendered her permanently disabled, testified that if the juvenile court ruled "no disposition," the family would reunite in Oklahoma, where they had alarmed the doors of D.T.'s and the victim's bedrooms and had installed cameras throughout the house. L.T. testified about her own experience as an incest victim and stated that D.T. needed intense, lifetime rehabilitation. She had already made appointments for D.T. with a psychiatrist to monitor his medication and a psychologist to modify his behavior and to help him understand the consequences of his actions and prevent further actions; Boehm had approved both providers. L.T. stated, "I know that [D.T.] is mentally ill, and I think that he needs help. I don't think he needs punishment." She opined that the progress D.T. had made was at boot camp, not in Dr. Sabine's program.

L.T. stated that the family meetings with Dr. Sabine had only been around 15 minutes once a month and were sometimes cancelled by him without notice. She testified that it concerned her that they were watching movies during group therapy and that she had watched "Les Miserables" and "was sickened by it." She stated that D.T. was very impressionable and that the movie was inappropriate because it "glorified" prostitution and rape and the "perpetrator laughed and got away with it." L.T. stated that she would "absolutely" do everything in her power to make sure D.T. was completely rehabilitated and a productive member of society.

On cross-examination, when asked whether she had taken any initiative to seek additional counseling for D.T., L.T. said that she had been "told that [she] couldn't because that would violate his probation because it would appear that [she] was attempting to change providers."[14]

D.T. recalled Box, who agreed that Dr. Sabine was the primary sex-offender treatment provider and who acknowledged that if D.T. had had another sex-offender treatment provider during his probation, "[t]here might be a problem between Dr. Sabine and the other treatment provider," and in such a case, the probation department would defer to Dr. Sabine. He also agreed that it was entirely within Dr. Sabine's discretion, "in conjunction with the Department," as to whether D.T. had completed his treatment or showed moderate progress. On cross-examination, however, he stated that D.T. could have sought additional, non-sex-offender, counseling.

---

[14]One of D.T.'s sex-offender probation conditions stated,

> Juvenile shall not change treatment programs. All treatment will be provided by the sex offender treatment provider approved by the Juvenile Board and only said treatment provider will be considered by the Juvenile Probation Department in evaluating said juvenile's compliance or non compliance with the terms and conditions of said juvenile's probation and/or successful completion of treatment.

Another condition stated that he would have to sign waivers of confidentiality to allow his supervising probation officer to communicate "with other professionals involved in juvenile's supervision and treatment, and to allow all professionals involved to communicate with each other. This will include a release of information to the therapist of the victim(s)."

### 4. The Parties' Arguments and the Juvenile Court's Conclusion

D.T.'s counsel argued that the State had not offered D.T. a program that would allow him to be successful and that the juvenile court should issue an order of no disposition, allow the family to reunite, and allow D.T. to undergo the treatment arranged by his mother.

The prosecutor replied that instead of finding D.T. a counselor during his probation, his parents had allowed him to be trained in jujitsu, stating, "You have a sex offender who is learning how to grapple and hold people down." He argued that L.T.'s treatment plan for D.T. was "all based on speculation," and he asked the juvenile court to continue D.T.'s probation until his eighteenth birthday.

The juvenile court found that D.T. had violated his probation, found that D.T. needed rehabilitation and that he and the public needed protection, and signed an order of disposition and modified order of probation to run until D.T.'s eighteenth birthday. In a letter to the parties, the juvenile court expressed that it was "torn between the unification of [D.T.'s] family and protecting the victim" and that it was unwilling to release D.T. from probation based on the nature of D.T.'s disclosures—particularly about his victim—and Dr. Sabine's testimony that "although [D.T.] is making progress in some areas, he is still high risk to reoffend." The juvenile court then stated,

> I also believe that [D.T.] is not receiving all the treatment that he needs in order to fully rehabilitate. I am going to extend [D.T.'s] probation until his 18th birthday and he is to remain in the sex offender treatment

program with Dr. Sabine, as I am bound by Section 54.0405 . . . to order treatment with a program specified by the Department.[15] I will also order that [D.T.] begin counseling with a health professional that specializes in autism. I expect the autism counselor and Dr. Sabine to cooperate in [D.T.'s] treatment and develop a plan that is tailored to [D.T.'s] unique needs and increases his likelihood of success through the program, including a determination of whether group or individual counseling is more suited for [D.T.]. The Department is ordered to provide quarterly reports to the Court regarding that plan and [D.T.'s] progression in the program. Dr. Sabine will still be the primary care provider and make the ultimate decisions about his care.

In addition, the Department is ordered to develop a plan for reunification of [D.T.'s] family. They are to work with [D.T.'s] family to develop a safety-based plan that permits [D.T.] to live in the household again as soon as the treatment providers determine[] it is safe for him to return.

If [D.T.] successfully completes the sex offender treatment program before his 18th birthday, the Court will entertain a motion for early release from probation.

**5. Analysis of D.T.'s Third Issue**

In his final issue, D.T. asserts that no evidence was presented that continuing his probation as it existed at the time of the hearing would result in any further progress in his rehabilitation and that such a continuation was contrary to the recommendations of Boehm, his expert witness. In recounting the flaws in Dr. Sabine's program, however, D.T. ignores the juvenile court's explanation of its

---

[15]Section 54.0405(c) requires psychological counseling as a probation condition for a child sex offender to be with an individual or organization that: (1) provides sex offender treatment or counseling; (2) is specified by the local juvenile probation department supervising the child; and (3) meets minimum standards of counseling established by the local juvenile probation department. Tex. Fam. Code Ann. § 54.0405(c).

decision, in which it ordered the probation department to develop a reunification plan and to provide quarterly reports to the court regarding a treatment plan customized to D.T.'s unique needs.

Considering all of the above under the applicable legal and factual sufficiency standards of review, the juvenile court had ample substantive and probative evidence upon which to draw its conclusions that D.T. was still at a high risk of reoffending if he failed to complete sex offender treatment and that his probation should therefore be continued at least until his successful completion of the sex offender treatment program, at which point he could move for early release from probation.[16] *See Shields*, 526 S.W.3d at 480; *Pool*, 715 S.W.2d at 635; *C.C.*, 2018 WL 1865804, at *3. Accordingly, we overrule D.T.'s final issue.

### III. Conclusion

Having overruled all of D.T.'s issues, we affirm the juvenile court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: October 28, 2021

---

[16]As the factfinder, the juvenile court was the sole judge of the witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).